**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROSEMARY F. SNEDDEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 9038** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rosemary Snedden seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 416. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a motion for summary judgment in which she seeks reversal or remand for further proceedings (Doc. 11), while Defendant filed a cross-motion that seeks affirmation of the decision (Doc. 19). For the following reasons, Plaintiff's motion is granted and Defendant's motion is denied.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on July 11, 2012, alleging that she became disabled on June 8, 2012 due to degenerative arthritis in her hands, asthma, a rotator cuff tear in her left shoulder, and high blood pressure. (R. 180, 201, 204). The Social Security Administration denied Plaintiff's application initially on October 22, 2012, and again upon reconsideration on May 2, 2013. (R. 93, 99). She then filed a timely request for a

hearing and appeared before Administrative Law Judge Victoria A. Ferrer (the "ALJ") on May 23, 2014. (R. 31-67). The ALJ heard testimony from Plaintiff, who was represented by counsel, and also a vocational expert ("VE"). On July 25, 2014, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work with several additional limitations, which rendered her capable of performing her past relevant work as a call center agent. (R. 17, 25). Accordingly, the ALJ concluded that Plaintiff was not disabled at any time from the alleged onset date through the date of decision, and she denied Plaintiff's application for benefits. (R. 25).

On November 11, 2014, Plaintiff filed a complaint for judicial review. In her motion for remand, she argues that the ALJ erred by: (1) overlooking certain testimony in the credibility determination; (2) failing to incorporate each of Plaintiff's impairments into the RFC; and (3) failing to correctly assess the medical opinion evidence, due to the ALJ's ignoring of an opinion by Plaintiff's treating psychiatrist, and mischaracterization of the opinion of a consulting psychologist who examined Plaintiff.

## FACTUAL BACKGROUND

Plaintiff was fifty-eight years of age at the time of the ALJ's decision. (R. 69). She lives with her adult daughter, has a high-school diploma, and prior to her application for DIB, she worked as a call center agent for over fourteen years. (R. 41, 205-06). She left her job and the work force on June 8, 2012 when she no longer could tolerate pain in her wrists while typing. (R. 36-37, 205). Although Plaintiff applied for work after that date, including several positions that involved some degree of typing, she has not been employed since June 2012. (R. 38-40).

**A.    Medical History**

**1.    January 2011 to December 2012**

The first evidence of record dates to January 10, 2011, when Plaintiff visited her primary care physician, Angela Sefah, M.D., for a general exam at Oak Forest Health Center ("Oak Forest").  (R. 291).  Dr. Sefah's notes reflect that Plaintiff complained of left shoulder pain.  (*Id.*).  Plaintiff's current medications included triamterene (for hypertension), enalapril (also for hypertension), an albuterol inhaler, and Tylenol 3 (for pain).  (*Id.*).  Plaintiff's past medical history, according to Dr. Sefah's notes, included bilateral ACL repairs, bilateral partial knee replacements, an abdominal hernia repair, right rotator cuff surgery, and right thumb surgery.  (R. 292).  Plaintiff's physical exam was normal, and Dr. Sefah observed normal range of motion, normal strength, normal gait, and absence of tenderness and swelling in Plaintiff's musculoskeletal system. (*Id.*).  She diagnosed Plaintiff with hypertension and obesity, along with controlled asthma and left shoulder pain.  (*Id.*).  Notes also stated that Plaintiff had recently lost 50 pounds intentionally, and Dr. Sefah recommended that Plaintiff continue her course of weight loss with a goal of ten pounds in the following three months.  (R. 291-92).

At Dr. Sefah's direction, Plaintiff returned for a follow-up appointment on April 5, 2011.  (R. 289).  Dr. Sefah noted Plaintiff's report of a left rotator cuff tear and left buttock pain.  (*Id.*).    Dr. Sefah observed limited range of motion in Plaintiff's left shoulder, and an absence of swelling or bruising in Plaintiff's buttock.  (*Id.*).  She diagnosed Plaintiff with rotator cuff syndrome and left buttock pain, added tramadol (a pain reliever) to Plaintiff's medication regimen, and referred her to an orthopedic

specialist for repair of her rotator cuff tear. (R. 290). Notes also indicate that Plaintiff had gained twelve pounds since the last visit.

Plaintiff next saw Dr. Sefah on October 17, 2011, at which time she reported that she had not yet made an appointment with an orthopedic specialist. (R. 286). Dr. Sefah again observed limited range of motion in Plaintiff's left shoulder, but otherwise Dr. Sefah found normal physical exam results. (R. 286-87). Plaintiff stated that the pain associated with the tear was relieved by the Tylenol. (R. 286). Dr. Sefah stated that Plaintiff's weight management was improving, with twenty-five pounds lost in the prior ten months, and she left Plaintiff's diagnoses unaltered and refilled the medication prescriptions.

Nearly six months later, on April 2, 2012, Plaintiff saw Dr. Sefah for a routine visit. Plaintiff complained of left shoulder pain with minimal improvement since the last visit. (R. 304). Plaintiff's physical exam was once again normal, aside from mild lower neck tenderness, moderate left shoulder pain and associated limited extension. (R. 305). Dr. Sefah found that Plaintiff's weight management was worsening (due to an eleven-pound weight gain), and she ordered Plaintiff to continue her present course of pain management, diet, and exercise and also referred her to physical therapy. (R. 305-06).

On May 21, 2012, Plaintiff attended an occupational therapy appointment at Oak Forest, at Dr. Sefah's recommendation. (R. 322). Plaintiff told the therapist that she had, in the past, improved her repaired right shoulder with therapy. She also explained that her left shoulder was painful during activities of daily life, reaching, lifting items, and while working on the computer. (*Id.*). During the physical exam, the therapist found

decreased range of motion and pain in Plaintiff's left shoulder during flexion, abduction, extension, and rotation, and accordingly, the therapist recommended that Plaintiff begin attending weekly therapy appointments. (R. 322-25). Plaintiff attended the first appointment on June 5, 2012 (a few days before she last worked), but she cancelled or did not appear for therapy following that date. (R. 318-20). At the hearing before the ALJ, Plaintiff explained that she experienced a "period of depression" at this time and lacked motivation to attend the appointments. (R. 45).

About one month later, on July 11, 2012, Plaintiff applied for DIB, alleging disability on the basis of arthritis in her hands, asthma, the left rotator cuff tear, and hypertension. On August 24, 2012, Plaintiff presented at Little Company of Mary Hospital's emergency department due to low back pain. (R. 332). After lifting a laundry basket, Plaintiff had developed pain in her right and left lower back. (R. 334). The treating doctor diagnosed her with a muscle strain, prescribed pain medication, and told her to follow-up with her primary care physician. (R. 333, 338). Not long after, on September 4, 2012, Plaintiff saw Dr. Sefah, who described Plaintiff as "tearful and stressed out . . . because [her] sister-in-law died and [she] lost her job." (R. 359). Dr. Sefah found normal physical exam results aside from mild tenderness in Plaintiff's lower back, refilled Plaintiff's hypertension medications, newly prescribed methocarbamol (a muscle relaxant), and she also diagnosed Plaintiff with depression and referred her to a psychiatrist. (R. 360-61).

On October 9, 2012, Plaintiff attended a consultative physical exam with M.S. Patil, M.D., at the request of the Illinois Bureau of Disability Determination Services ("DDS"). (R. 363). Plaintiff told Dr. Patil that she had a long history of asthma and

hypertension, arthritis with recurrent stiffness and pain in her hands, and neck pain that sometimes radiated through her back. (*Id.*). Dr. Patil noted that Plaintiff had a left rotator cuff tear that had not yet been repaired, along with prior ACL repairs and knee replacement surgeries. (R. 363-64). At that time, Plaintiff's current medications included methocarbamol, Tylenol, enalapril, triamterene, and albuterol inhalers. (*Id.*). Plaintiff's physical examination was essentially normal. She appeared moderately obese, with normal gait, and normal heart sounds (without arrhythmia or tachycardia), but she had limited range of motion in her cervical and lumbar spine and also in her shoulders. (R. 365). Dr. Patil found that Plaintiff had mild difficulty with certain fine and gross manipulations. (R. 366). In an x-ray of her left hand, Dr. Patil found osteoarthritis and in an x-ray of her cervical spine, he found some straightening that might have been "secondary to muscle spasms, pain, or positioning." He also observed moderate narrowing of intervertebral disc space and mild narrowing of the C4-C5 neural foramen. (R. 367). Dr. Patil noted that Plaintiff's chronic asthma and hypertension were stable and controlled. (*Id.*).

Not long after, on October 17, 2012, non-examining physician Reynaldo Gotanco, M.D., completed a consulting opinion for DDS. (R. 69-75). Dr. Gotanco opined that Plaintiff had decreased range of motion in her cervical spine, shoulders, and knees, but no signs of muscle wasting or paralysis. (R. 75). Notwithstanding these limitations and also the osteoarthritis in her left hand, Dr. Gotanco opined that Plaintiff's limitations would not preclude her from performing her past work as a call center agent. (R. 75-76). Days later, on October 22, 2012, Plaintiff's application for DIB was denied. She sought reconsideration, and alleged that her condition had worsened because she

had been diagnosed with depression and had developed pain in both shoulders. (R. 224).

On December 17, 2012, Plaintiff attended a musculoskeletal outpatient appointment at Oak Forest due to left shoulder and neck pain. (R. 377). She stated that pain was constant but fluctuated in intensity, and she told the doctor that medication and therapy alleviated the pain. (*Id.*). During the physical exam, the doctor found that Plaintiff's left shoulder was limited in range of motion and strength. (R. 379). The doctor diagnosed her with shoulder pain and refilled her prescriptions for Tylenol 3, methocarbamol, and tramadol. (R. 380).

Notes from the musculoskeletal appointment also reflect that Plaintiff was taking citalopram and trazodone (each an antidepressant) as of this date. (R. 378). As earlier stated, Dr. Sefah referred Plaintiff to a psychiatrist in September 2012, but the record does not contain notes or otherwise document a psychiatric visit between the appointment with Dr. Sefah and this musculoskeletal visit. However, Plaintiff testified at the hearing before the ALJ that she had visited psychiatrist Kaleel Khan, M.D. at Oak Forest Urgent Care and he apparently prescribed these antidepressants, so although it is unclear exactly when Plaintiff began a course of psychiatric care (and the extent of that treatment), the record establishes that she began taking antidepressants sometime in fall 2012.

### 2. January 2013 to April 2014

Plaintiff attended a consultative psychological exam with Jeffrey Karr, Ph.D., on April 11, 2013 at the request of DDS. (R. 226, 384). Dr. Karr's report describes Plaintiff's life circumstances and daily activities, and also recites above-mentioned

portions of her medical history. (R. 384-85). Dr. Karr noted that Plaintiff had recently run out of medication and that, according to Plaintiff, she quickly angers and is unable to sleep when she is unmedicated. (R. 385). Plaintiff told Dr. Karr that she was depressed and had seen a psychiatrist six months earlier (presumably Dr. Khan, whose notes are not part of the record), and she described associated symptoms of withdrawal, sleep problems, irritability, persistent sadness, inability to relax, constant worrying, and some racing thoughts. (*Id.*). In the exam, Dr. Karr observed that Plaintiff had heightened affect, rapid and pressured speech, and lengthy responses "that at times were tangential." (*Id.*). Although she lacked visible physical distress and tremors, she appeared "intense, on-edge, anxious." (R. 386). Dr. Karr observed "no manifest signs of gross psychopathy," but he nevertheless diagnosed Plaintiff with major depressive disorder and anxiety disorder, as her alleged depressive symptoms were "consistent with her presentation . . . ." (R. 386-87).

Plaintiff visited Oak Forest psychiatrist Samina Khattak, M.D., on April 24, 2013 and complained that she had run out of medication. (R. 392). Dr. Khattak's notes reflect that Plaintiff had been unable to attend previous scheduled psychiatric appointments (the record does not indicate why), and also that Plaintiff's constant pain affected her ability "to do anything." (*Id.*). Notes reflect that Plaintiff had been taking Xanax to relieve anxiety for the past several months, and Dr. Khattak diagnosed her with major depressive disorder that she characterized as "worsening." (R. 394). She refilled prescriptions for trazodone and citalopram. (*Id.*).

Non-examining psychologist Lionel Hudspeth, Psy.D., completed a consulting opinion for DDS on April 29, 2013. Dr. Hudspeth reviewed records related to Plaintiff's

mental health treatment, including the consulting exam report by Dr. Karr (but not the April 24 treatment note from Dr. Khattak). Dr. Hudspeth opined:

> It is reasonable for this claimant to experience some mild depressive and anxiety symptoms, secondary to financial/life circumstance issues as well as physical issues. Claimant's limitations are more related to physical and life circumstance issues rather than to due to [sic] a severe mental disorder. This is a non severe mental impairment.

(R. 84). The following day, non-examining physician Vidya Madala, M.D. also wrote a consulting opinion for DDS that was identical to Dr. Gotanco's earlier opinion from October 2012. A few days later, on May 2, 2013, Plaintiff saw Dr. Sefah for a routine appointment, at which Plaintiff's diagnoses remained unchanged and Dr. Sefah continued the ongoing management of her physical conditions. (R. 395-96). Plaintiff's application for benefits was again denied on the same day.

On May 19, 2013, Plaintiff visited MetroSouth Medical Center ("MetroSouth") with complaints of lumbar pain. (R. 437). The emergency room physician treated her pain with injectable medication, and she was discharged with Percocet and Valium for pain relief. (R. 438, 443). About two months later, on July 29, 2013, Plaintiff was admitted at Rush University Medical Center after she fell down five steps while walking her dog. (R. 404). She sustained traumatic hemorrhages in her head, lacerations on her forehand and right hand, a hematoma on her right eye, and abrasions on her right knee and right hand. (R. 405-06). A CT of the brain performed during the visit evidenced hemorrhaging, cerebral atrophy and small vessel ischemic disease, while CTs of the spine evidenced no acute spinal injury but some abnormalities (including disc/osteophyte complex, multilevel foraminal stenosis, and anterolisthesis in the cervical spine). (R. 409). At discharge, Plaintiff was prescribed Norco (a pain reliever),

Keppra (an anticonvulsant), and acetaminophen. (R. 424). Plaintiff was told she may resume her taking citalopram, enalpril, trazodone, and her inhalers as needed. (*Id.*). However, Plaintiff testified at her hearing that she did not resume taking the antidepressants (citalopram and trazadone) because she did not believe they were helpful and they made her "very drowsy." (R. 46). Notes following this date reflect no prescriptions for antidepressants or other psychiatric treatment.

On August 31, 2013, Plaintiff saw Solomon Okai, M.D., her new primary care physician, to follow-up on the July injury. She reported some residual hearing loss, swelling, neck pain, dizziness and headaches, along with preexisting arthritic pain in the hands and knees. (R. 535). During the physical exam, Dr. Okai noted limited range of motion in both shoulders, and back pain due to torn ligaments (the record does not indicate the cause of this injury). (R. 536). On October 31, 2013, Plaintiff returned to MetroSouth with complaints of low back pain, and she was discharged with prescriptions for Vicodin (a pain reliever) and prednisone (an anti-inflammatory). (R. 472-73). Plaintiff later explained at the administrative hearing that her visit to MetroSouth (along with several others described hereafter) was for the specific purpose of obtaining these pain medications, as Dr. Okai was unable or unwilling to prescribe them. (R. 50-51). About two weeks later, on November 9, 2013, Plaintiff returned to Dr. Okai and complained of back pain. Her physical exam was normal, but Dr. Okai observed that she was grossly overweight and had tenderness in her lower back. (R. 537). On November 21, 2013, Plaintiff visited MetroSouth due to sudden chest pain. (R. 488). A chest x-ray evidenced a moderately enlarged heart, but otherwise, Plaintiff's chest was stable, and the doctor concluded that her chest pain was likely related to

gastrointestinal issues. (R. 489, 493). She was discharged when the pain was controlled. (R. 489).

On December 22, 2013, Plaintiff presented at MetroSouth complaining of low back pain. As with prior visits, the physical exam was normal aside from lower back pain, and she was discharged with Norco and prednisone. She told the doctor that medications and rest alleviated her pain. (R. 526-27). At a January 1, 2014 follow-up appointment with Dr. Okai, Plaintiff was diagnosed with degenerative joint disease of the lumbar spine on the basis of a December 17, 2013 x-ray. (R. 539). Plaintiff again complained of back pain at the visit, and Dr. Okai prescribed tramadol and referred her to a neurology specialist. (R. 540). His notes also documented morbid obesity, as Plaintiff was at least 100 pounds overweight (the recent MetroSouth visit note documented a body mass index of 37.1 (*see* R. 525)).

On February 23, 2014, Plaintiff again visited MetroSouth due to back pain. She told doctors that "lying still" and medications improved her symptoms, and she was discharged with Norco and Flexeril (a muscle relaxant). (R. 548-49). Likewise, Plaintiff visited MetroSouth due to pack pain on March 31, 2014, and was discharged with Norco. (R. 565-66). Plaintiff then saw Michael Sturgill, M.D., a neurological specialist, on April 18, 2014, and Dr. Sturgill suggested that Plaintiff's back pain was likely related to sacroilitis. (R. 579-80). Dr. Sturgill found normal range of motion in Plaintiff's neck but right-sided pain in the sacroiliac joint, and he ordered an MRI of the thoracic spine and x-rays of the lumbar and cervical spines (the results of which, if obtained, are not in the record). (R. 580). He further suggested that she may be a candidate for a sacroiliac injection (for pain relief). (*Id.*). The visit with Dr. Sturgill on April 18, 2014 is

the last medical appointment of record. Plaintiff then appeared before the ALJ for a hearing on May 23, 2014.

**B.    The ALJ's Decision**

In a decision dated July 25, 2014, the ALJ determined that Plaintiff has degenerative joint disease of the right knee, status post partial knee prosthetic, degenerative disc disease of the lumbar and cervical spine, osteoarthritis in the left hand, partial left rotator cuff tear, bilateral rotator cuff syndrome, and obesity, each a severe impairment under the Social Security regulations.  (R. 14).  The ALJ also acknowledged that Plaintiff has asthma, depression, and anxiety disorder, but concluded that none of these impairments caused more than a minimal limitation in Plaintiff's ability to perform basic work activities.  (R. 15-16).  The ALJ next evaluated whether Plaintiff's severe impairments met or medically equaled the severity of the impairments listed in the appendices to Subpart P of 20 C.F.R. Part 404, and she found that none of the impairments, alone or in combination, met the criteria of the relevant listings.  (R. 16-17).

Thereafter, the ALJ found that Plaintiff's RFC (that is, what Plaintiff can still do despite her limitations) permitted light work and allowed her to return to her job as a call center agent.  Plaintiff also had the following additional restrictions to her RFC: she could only occasionally lift or carry twenty pounds, but frequently lift or carry ten pounds; she could sit for six hours in an eight-hour work day, and stand or walk for six hours in an eight-hour work day, but could sit continuously for only thirty minutes before needing two minutes of standing or walking; she could only occasionally climb ramps, stairs, ladders, ropes, or scaffolds; she could only occasionally crouch, reach in front laterally

and above the shoulder level bilaterally; and she could frequently perform bilateral gross manipulations.[1] (R. 17). In addition, Plaintiff must avoid concentrated exposure to wetness or humidity, pulmonary irritants, and hazards such as hazardous machinery, working in high exposed places, and working with sharp objects. (*Id.*).

In making the RFC determination, the ALJ reviewed and considered Plaintiff's subjective complaints and allegations, her daily activities, medical records, and medical opinions, including the one given by non-examining psychologist Dr. Hudspeth on April 29, 2013. (R. 17-25). The ALJ specifically discussed the consulting report of examining psychologist Dr. Karr, who examined Plaintiff on April 11, 2013, and in that discussion, the ALJ mistakenly attributed to Dr. Karr portions of Dr. Hudspeth's opinion interpreting his report, as further discussed below. Additionally, the ALJ afforded "great weight" to each of the opinions offered by the DDS doctors (Dr. Hudspeth, Dr. Gotanco, and Dr. Madala). In addition, the ALJ's opinion discussed at great length the medical evidence in relation to each one of Plaintiff's conditions. (*See* R. 19-24).

The ALJ found not credible Plaintiff's allegations regarding the extent of her pain and symptoms. In so concluding, she cited lack of objective support for the extent of limitations Plaintiff alleged, inconsistency in Plaintiff's testimony and daily activities, and Plaintiff's application for jobs involving typing after her alleged onset date despite her allegation that she no longer could type due to pain. (R. 19-24). Therefore, relying on

---

[1] At one point, the ALJ stated that Plaintiff's RFC allowed her to perform *medium* work with certain restrictions (R. 17), but narrative text several pages later stated that Plaintiff could perform light work. (*Compare* R. 17 *with* R. 23). The ALJ's incorporation of limitations at the 20 and 10 pound weight levels suggest that the ALJ intended to say that Plaintiff could perform light work, since these weight levels are part of the regulatory definition of "light" (but not medium) work. *See* 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").

the testimony of the VE, the ALJ determined at step four that Plaintiff could return to her past relevant work as a call center agent, a job classified at the sedentary level, and the ALJ thus concluded that Plaintiff was not disabled at any time between the alleged onset date and the date of decision. (R. 25).

**DISCUSSION**

**A.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The Court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009)

(quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).  Similarly, where the Commissioner's decision "lacks adequate discussion of the issues," Seventh Circuit precedent requires remand.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing cases).

## B.    Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.  *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[2]  A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."  *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009) (quoting 42 U.S.C. § 423(d)(1)(A)).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

The Court examines each of the three claims of error made by the ALJ in turn.

---

[2]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*

### 1.     Credibility Determination

The ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely credible . . . ." (R. 19).  She did not provide clear or organized reasons, but it appears that the basis for her finding was: a lack of objective evidence for Plaintiff's allegations (R. 19-24); inconsistency in some of Plaintiff's allegations (such as her testimony she was unable to walk her dog but admissions in her medical records that she walked her dog regularly) (R. 21); inconsistency between Plaintiff's allegations and her activities of daily living (*Id.*); and her job applications following the alleged onset date for employment that involved typing, despite her allegation that pain prevented her from typing.  (R. 18-19, 21).

Plaintiff argues that the ALJ erred in the credibility determination by ignoring her allegations about medication side effects and her need to lie down several times per day.  It is true that the ALJ made no specific mention of or finding about Plaintiff's testimony at the hearing that (1) she lies down six times each day, in thirty minute intervals, "mostly because of the pain" (R. 61), and (2) her medications cause drowsiness, dizziness, and other side effects.  The Court agrees that the ALJ erred when analyzing the evidence regarding Plaintiff's alleged need to lie down regularly. The VE testified, in response to a question by Plaintiff's attorney, that Plaintiff would not be able to sustain her past relevant work—or apparently, any work—if she indeed were required to lie down for thirty minutes, six times daily.  (*See* R. 65).

Defendant cites *Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) for the proposition that a need to lie down requires medical evidence, and the Seventh Circuit has found no error in an ALJ's rejection of testimony about a claimant's need to lie down

when the medical evidence—in particular, the opinions of medical providers—provided no corroboration for the allegation. *See Books v. Chater*, 91 F.3d 972, 981 (7th Cir. 1996). Yet in *Indoranto v. Barnhart*, the Seventh Circuit remanded a decision in which the ALJ had "disbeliev[ed] in particular [the plaintiff's] testimony that her pain required her to lie down . . ." on the basis that the allegation lacked clinical support. 374 F.3d 470, 473-74 (7th Cir. 2004). Notwithstanding the deference courts owe to an ALJ's credibility finding, the Seventh Circuit noted that the record was "replete with evidence" of the plaintiff's severe back pain and there was "nothing incredible or inconsistent about her statements that she lies down . . . during the day to alleviate her pain[,]" and it remanded the case on account of this evidence. *Id*. at 475.

*Indoranto* is persuasive here. The ALJ made no mention of Plaintiff's testimony regarding her need to lie down throughout the day, yet the record has ample facts to make Plaintiff's allegation plausible. As earlier stated, Plaintiff was diagnosed with a degenerative back condition, apparently had ligament tears in her back, and had well-documented obesity. She made recurring emergency room visits for strong opioid medications to alleviate back pain, and saw at least one specialist about her back condition. The notion that she must lie down to alleviate pain, as she stated at the hearing, is not far-fetched. Notably, the hearing was not the first time she stated that lying down alleviated her pain; medical records reflect that she told doctors at MetroSouth that this was an ameliorative measure on at least two occasions, each several months prior to her administrative hearing. While the Court does not tell the ALJ that she should or must find the testimony credible, the ALJ should have made a

specific finding about this statement, supported the finding with specific reasons based on the record.

Further, none of the ALJ's credibility findings was inconsistent with Plaintiff's testimony that she must lie down regularly. The ALJ observed that Plaintiff performs only light chores, such as dusting, and these would allow her to take the rest breaks about which she testified. (R. 19). In the discussion of medical evidence related to Plaintiff's degenerative lumbar condition, the ALJ does not reason that Plaintiff's allegation about lying down regularly cannot be substantiated by the evidence. Finally, it is not apparent why certain normal physical exam results (such as normal gait, absence of extremity pain, normal reflexes, and the like) would necessarily be inconsistent with her testimony that she needs to lie down several times each day. (*See* R. 19-20). At heart, the veracity of Plaintiff's allegation is a key factual question, and the lack of a specific discussion about the credibility of this statement prevents the Court from meaningfully reviewing the determination in this case. Thus, the Court remands the decision so the ALJ can address this testimony in the context of the assessment and Plaintiff's RFC and logically bridge the evidence to the conclusion.

Since the Court is remanding the case, the ALJ should also address Plaintiff's allegations about medication side effects since there is no discussion of them in the ALJ's decision. Plaintiff complained in her application that her medications caused drowsiness, constipation, dizziness, and frequent urination, and at the administrative hearing, she stated that citalopram, which she began taking following her depression diagnosis, made her drowsy. (R. 45-47, 220, 241). These side effects may not alter the

RFC assessment, but the ALJ should take the opportunity to address this upon remand to resolve any uncertainty.

### 2. Additional Impairments

Relying on SSR 96-8p, Plaintiff next contends that the ALJ failed to consider each of her impairments and therefore the RFC assessment is flawed. Specifically, she identifies the following: evidence of a mild cardiomegaly (enlarged heart), a small pericardial effusion (fluid around the heart), cerebral atrophy, chronic small vessel ischemic disease (deterioration to small arteries in the brain), old lacunar infarcts (past strokes from the ischemic disease), diverticulosis (formation of small, bulging pockets in the colon), and a hiatal hernia. (Doc. 12, at 12).

Plaintiff's argument fails. Although each condition is documented in the medical records, Plaintiff makes no attempt to identify particular limitations that resulted from these conditions for which the RFC assessment should have accounted. While it is generally true that the Seventh Circuit has found reversible error in an ALJ's failure to consider each of a claimant's medically determinable impairments, *see Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003), this case differs because it is not apparent that the conditions the ALJ allegedly ignored limited Plaintiff in any way. *See also Terry*, 580 F.3d at 477 (similarly finding error when the RFC did not account for impairments that imposed particular limitations). In other words, although Plaintiff has identified a handful of medical conditions, she has not argued, much less demonstrated, that any of them are "impairments" that affect her RFC.

For example, as to the heart conditions (cardiomegaly and pericardial effusion), Plaintiff does not explain how they relate to any functional limitation that she has alleged

is disabling (which generally concern pain in her extremities and back).  Thus, it is unclear why the ALJ's omission constitutes reversible error.  Notably, Plaintiff's doctors found the condition of her chest stable in an emergency room visit for chest pain, notwithstanding these heart abnormalities, and none of the conditions was of serious concern to them.  (*See* R. 489, 493).  Nor did Plaintiff seek out care related to the heart conditions.  Likewise, as to the diverticulosis, nothing in the record suggests a particular limitation with which Plaintiff copes as a result of the condition, and Plaintiff does not identify what such a limitation might be.  The same is true of the other conditions she identifies.  Because the ALJ need not discuss each piece of evidence in the record, and because there is no basis for concluding that the lack of discussion of the handful of conditions Plaintiff identifies would have altered the RFC, there was no error in the ALJ's decision on this point.

### 3. Medical Opinions

Finally, Plaintiff urges that the ALJ did not properly consider and weigh all the medical opinion evidence because the ALJ ignored the opinion of Plaintiff's treating psychiatrist and mischaracterized the opinion of a consulting psychologist.

#### a. Dr. Khattak

Plaintiff argues that the ALJ failed to consider Dr. Khattak's opinion about her depression.  "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).  ALJs are obligated to

consider each of the medical opinions in the record, *see id.* § 404.1527(b) (the ALJ "will always consider the medical opinions in [the claimant's] case record . . ."), and the regulations provide several factors for determining the weight the ALJ is to afford an opinion based upon its source (whether a treating doctor or only a non-examining consultant) and its supportability. *See generally id.* § 404.1527(c). The ALJ must offer "good reasons" for the weight she assigns. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2010).

In the "History of Present Illness" ("HPI") section of the April 24, 2013 visit note, Dr. Khattak wrote: "The patient presents with a psychiatric problem. The psychiatric problem(s) is described as depression and anxiety. The severity of the psychiatric problem(s) is moderate. The psychiatric problem(s) is worsening." (R. 392). Plaintiff interprets this as an opinion that the ALJ failed to consider. The argument is unconvincing for several reasons. First, Plaintiff overlooks that the HPI is not a portion of the treatment note where a doctor offers an objective assessment or opinion. Instead, the HPI merely reflects the patient's subjective statements about the problem for which she is seeking care and a history of that problem, if any. *See* Peter R. Lichstein, Clinical Methods: The History, Physical, and Laboratory Examinations 32 (3d ed. 1990) (explaining that the HPI reflects subjective information shared by the patient: "[t]he history of the present illness (HPI) includes all of the patient's history, both recent and remote, that is pertinent to understanding the current illness. In completing the HPI, the physician will often collect pertinent information about the patient's past history . . . , the patient's family history . . . , and the social history . . . ."); *Wieczorek v. Colvin*, No. 13 C 4017, 2014 WL 3811015, at *7 (N.D. Ill. July 31, 2014) (explaining that a treatment

note's HPI section reflected the plaintiff's "own subjective complaints about his symptoms").  Accordingly, this portion of the note is not an "opinion" of Dr. Khattak and the ALJ would have been incorrect to consider it as one.

Second, to the extent that Dr. Khattak offered a medical opinion, the ALJ did consider it.  As described, Dr. Khattak stated in an objective portion of her note (although not pointed to by Plaintiff) that the depression was "worsening."  (R. 394).  The regulations require the ALJ to *consider* every medical opinion, and although the ALJ does not expressly quote this portion of the note, she specifically discussed Dr. Khattak's treatment note in her decision.  (R. 23).  This is the sole treatment note of record from Dr. Khattak, and thus, the position that the ALJ failed to consider the prognosis is tenuous.

But even if the ALJ erred by not discussing and weighting this opinion about the prognosis of Plaintiff's depression, the error was harmless.  Notably, Dr. Khattak apparently saw Plaintiff on only one occasion, and this raises the question of how Dr. Khattak could assess that Plaintiff's condition was worsening, since Dr. Khattak lacked a baseline from which to measure the supposed deterioration of Plaintiff's depression.  In addition, Plaintiff herself testified that the depression was periodic, and she spoke of it in the past tense at the hearing.  She testified that she stopped taking her medications following a temporary cessation during her July 29, 2013 hospital stay, and she did not resume taking the antidepressants because she felt better when she was not medicated.  Accordingly, even had the ALJ discussed Dr. Khattak's opinion that the depression was "worsening" and weighted that opinion, Plaintiff's own testimony

contradicted the prognosis and thereby entitled Dr. Khattak's opinion to minimal (if any) weight.

### b. Dr. Karr (and Dr. Hudspeth)

Plaintiff finally argues that the ALJ erred by mischaracterizing the opinion of Dr. Karr, a psychologist who performed a consulting examination at the request of DDS. The ALJ wrote in her decision: "Dr. Karr further noted that the claimant's limitations were more related to physical and life circumstance issues rather than to due to a severe mental disorder and thus, concluded the claimant's condition non-severe." (R. 23) (sic). Actually, it was Dr. Hudspeth who gave this opinion. While Dr. Karr discussed Plaintiff's life difficulties in his post-examination note, he diagnosed her with depression and he did not opine that her symptoms owed to those difficulties. (*See* R. 384-87). Dr. Hudspeth, the non-examining psychiatrist, interpreted Dr. Karr's report and other parts of the record, and it was he who wrote the opinion that the ALJ attributed to Dr. Karr. (*Compare* R. 23 *with* R. 84). The ALJ went on to greatly weight Dr. Hudspeth's opinion.

Although Plaintiff is correct that the ALJ misstated the opinion (attributing Dr. Hudspeth's opinion to Dr. Karr), this was harmless since another clinician of record offered the opinion and that opinion was ultimately incorporated into the RFC assessment. That said, there is a need for remand due to a related and more significant error: the ALJ's weighting of Dr. Hudspeth's opinion. Although Plaintiff does not argue this point, the Court notes that the ALJ offered no reasons at all for greatly weighting Dr. Hudspeth's opinion. Instead, the decision describes only what Dr. Hudspeth said. (*See* R. 24). This is reversible error, since the ALJ must provide "good reasons" for the weight she assigns to a medical opinion. *Scott*, 647 F.3d at 739;

*Bauer*, 532 F.3d at 608.  On remand, the ALJ should revisit the medical opinions and provide legally sufficient reasons for the weight she assigns.

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 11) is granted and Defendant's cross-motion (Doc. 19) is denied.  Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

ENTER:

Dated:  February 29, 2016

SHEILA FINNEGAN
United States Magistrate Judge